# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TAMORA PIERCE,**

**Plaintiff,**

**-vs-**                                                            **Case No.  6:06-cv-292-Orl-19KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by

Tamora Pierce, seeking review of the final decision of the Commissioner of Social Security

denying her claim for social security benefits.  Doc. No. 1.  The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration

(SSA).  Doc. Nos. 8, 9.  This matter has been referred to me for issuance of a report and

recommendation pursuant to 28 U.S.C. § 636(b) and Middle District of Florida Local Rule

6.01(c)(21).

**I.      PROCEDURAL  HISTORY.**

In November 1985, Michelle Pierce, mother of Plaintiff Tamora Pierce (Pierce), filed an

application for benefits on behalf of Pierce under the children's disability provisions of the

Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381,

*et seq*., (sometimes referred to herein as the Act).  R. 43-52.  The Commissioner determined that

Pierce was disabled under the childhood social security regulation 111.07A for cerebral palsy, and

Pierce was awarded benefits.  R. 53.[1]

Upon reaching the age of 18[2], Pierce's case was reviewed to ensure that she was disabled

under the disability rules for adults.  R. 118-19.  In April 2002, the Commissioner determined that

Pierce's disability ended on April 1, 2002.  R. 150-56.  After a hearing, a disability hearing officer

concluded that Pierce was not disabled as of April 1, 2002.  R. 185-92.

Pierce made a timely request for a hearing before an administrative law judge (ALJ).  R.

196.  An ALJ held a hearing on May 22, 2003.  R. 22.  Pierce and her mother testified at the

hearing. No other testimony was taken.  R. 22-35.

On June 20, 2003, the ALJ issued a decision finding that Pierce was not disabled.  The ALJ

further concluded that Pierce's eligibility for SSI benefits as a child ended effective June 1, 2002,

which was the second month following the month in which she was first notified that she was no

longer disabled.  R. 7-16.  Pierce requested review of the ALJ's decision.  R. 6.  On August 1,

2000, after considering additional medical evidence, the Appeals Council denied review.  R. 4-6.

On September 22, 2003, Pierce timely appealed the Appeals Council's decision to this Court.

*Pierce v. Barnhart*, Case No. 6:03-cv-1361-Orl-JGG.

---

[1]  The Code of Federal Regulations "contains a Listing of Impairments specifying almost
every sort of medical problem ('impairment') from which a person can suffer, sorted into general
categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20
C.F.R. Part 404, Subpt. P, App. 1.

[2]  Pierce turned 18 on October 27, 2001.  R. 15.

After the complaint was filed, the Commissioner moved to remand the case for further action, which the Honorable James G. Glazebrook, United States Magistrate Judge, set for a hearing. R. 352-65. On August 10, 2004, Judge Glazebrook granted the Commissioner's motion and remanded the case to the SSA. R. 363-65.

Following entry of Judge Glazebrook's order, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. R. 384-85. On February 26, 2005, the Appeals Council directed the ALJ, on remand, to perform the following tasks:

> obtain updated consultative examinations which specifically provide opinions as to the claimant's work capabilities; to reassess the claimant's residual functional capacity with appropriate rationale; to provide rationale regarding the claimant's credibility and reasons for discounting her subjective complaints; obtain vocational expert evidence to identify jobs which claimant can do that exist in significant numbers; and evaluate the earnings from wages posted on the claimant's earnings record after the filing of the claim for benefits.

R. 384.

Thereafter, the same ALJ held a supplemental hearing on July 27, 2005. R. 424-39. Pierce, represented by a person who was not an attorney, testified at the hearing. R. 343. Susanna Roche, a vocational expert (VE), also testified. R. 435-39. The Commissioner concedes that the ALJ did not obtain updated consultative examinations as required by the Appeals Council. Doc. No. 33 at 10.

On November 2, 2005, the ALJ issued a decision finding that Pierce was not disabled for purposes of the Act. R. 342-49. He concluded that Pierce had not engaged in substantial gainful activity since her alleged disability onset date, despite having minimal earnings. R. 343-44. He found that the medical evidence showed that Pierce had mild cerebral palsy and borderline

intellectual functioning.  R. 346.  The ALJ concluded that these were severe impairments but that they did not meet or medically equal the impairments listed in the SSA regulations.  R. 346.

After considering all of the evidence in the record, the ALJ found that Pierce had the residual functional capacity (RFC) to perform a full range of unskilled light work activities.[3]  R. 347.  The ALJ further found that Pierce's nonexertional impairments stemming from her mild cerebral palsy and borderline intellectual functioning would not significantly limit her ability to perform unskilled light work activities.  R. 348.  The ALJ did not support this finding with a Psychiatric Review Technique Form (PRTF), and he did not incorporate the PRTF mode of analysis into his decision.

In reaching his RFC determination, the ALJ concluded that Pierce's "assertions of disabling impairments are not supported by the objective medical evidence to the extent alleged and . . . are inconsistent with her demonstrated abilities to perform work activities that value accuracy ahead of speed."  R. 347.  The ALJ also concluded that the record did not support Pierce's assertion that she would have to miss two to three days of work weekly due to leg discomfort.  R. 348.  Finally, the ALJ noted the VE's testimony that even an individual with moderate inability to remember could perform the jobs identified by the VE.  R. 347-48.

In reviewing Pierce's past work, the ALJ concluded that none of her prior work attempts were at a level that is considered substantial gainful work.  R. 347.  Thus, Pierce had no past

---

[3] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).

relevant work.  R. 347.  Relying on the testimony of the VE and considering the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, as a framework, taking into consideration an individual with an I.Q. of 74 and having a "special" high school education, the ALJ concluded that Pierce could perform the jobs of housekeeper in hotels and motels, or the job of cafeteria attendant, both of which existed in significant numbers in the national economy.  R. 347.  Accordingly, the ALJ concluded that Pierce was not disabled.  R. 348.

Pierce did not request review of the ALJ's decision from the Appeals Council.  Instead, she sought review of the decision by this Court.  Doc. No. 1.

## II.    JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Court remanded the case, as the Appeals Council did not assume jurisdiction.  20 C.F.R. § 416.1484(d).  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

A.    *Pierce's Testimony.*

Pierce was born on October 27, 1983.  R. 25, 427.  She completed high school in the special education program.  R. 25, 28, 427.

At the time of the first hearing, Pierce worked at Goodwill Industries, hanging clothes that the store received as donations.  R. 26.  She had been working there for less than a year.  R. 28.  At the second hearing, she testified that she could no longer work there because she could not do her job fast enough.  R. 434; *see also* R. 338.  Pierce also worked at McDonalds as a cashier for

approximately two months.  R. 428.  She had problems working as a cashier because she could not count the money fast enough.  R. 434.

Pierce had cerebral palsy, for which she was not seeing a doctor.  R. 26.  At the time of the first hearing, she had general pain throughout her body, but mostly in her right leg and ankle.  R. 2, 432.  Her right leg is smaller than her left leg.  R. 29.  The pain made it difficult for her to stand for more than one-half hour.  R. 26, 29.  Pierce also had trouble lifting objects.  R. 29.  She estimated that she could only lift about five to ten pounds.  R. 30.  She had no trouble sitting.  R. 30, 434.  She was not taking any medication, and she had not been hospitalized in the year before the first hearing.  R. 27.  At the first hearing, Michelle Pierce testified that Pierce was "doing the same," although she hurt more than normal.  R. 30.  Michelle Pierce had not observed Pierce having seizures, although she sometimes stared into space.  R. 31.

At the time of her second hearing, Pierce testified that she continued to have body pain and that her legs would occasionally go out.  R. 428.  Sometimes she would need assistance getting out of bed.  R. 428.  She had problems with her hands, as they would shake and she would drop things.  R. 434.  Her pain was not constant.  R. 428.  She had bad days about twice a week.  R. 432.  During the bad days, her body hurt.  R. 433.  When her body hurt, she needed help bathing.  R. 433.  She also experienced occasional headaches.  R. 430.   Medication did not ease her pain.  R. 428, 430.  She did not sleep well at night because she was nervous.  R. 433.

On good days, Pierce could walk for approximately half an hour.  R. 431.  She could walk to a store next to her apartment and could stand for about twenty minutes.  R. 433-34.  Sometimes while standing, she would lose her balance.  R. 431.  She could pick up a bag of potatoes.  R. 431.

Pierce lived with her mother and sisters.  R. 429.  On a typical day, Pierce woke up around 10:00 a.m.  She would shower, clean up, and then watch television on and off all day.  R. 429.  Pierce helped with cleaning the house.  She washed clothes, and cleaned the dishes.  She did little cooking.  R. 429. During the afternoon, she sometimes went outside.  R. 430.  She enjoyed talking on the phone and going to stores.  R. 432.   She had trouble reading, and therefore did not read very often.  R. 28.

Pierce did not have a driver's license and relied on the city bus for transportation.  R. 32, 429.

B.      *VE's Testimony.*

At the second hearing, the VE was asked to consider a hypothetical claimant of Pierce's age, education, and lack of past relevant work.  This claimant had an IQ rating of approximately 74 and a maximum sustained exertional work capacity to perform light work.  R. 436.  The VE responded that such an individual could perform the jobs of housekeeper at hotels and motels and cafeteria attendant.  R. 436.  Both of these jobs existed in significant numbers in the regional and national economy.  R. 436.

The VE was next asked by Pierce's representative to assume that the hypothetical claimant would miss work two to three times a week due to leg numbness and throbbing.  R. 437.  The VE opined that the hypothetical claimant could not perform the jobs of housekeeper or cafeteria attendant if she missed work two to three times a week.  R. 437.

The VE was next asked if the hypothetical claimant could perform the previously stated jobs if the individual had a moderate inability to understand and remember.  R. 437.  The VE responded that the claimant could still perform those jobs.  R. 437.  The VE was next asked to

assume that the claimant had difficulty with fine motor coordination.  R. 437. The VE opined that,
because both jobs only required occasional fingering, the claimant could perform the jobs.  R. 438.
Lastly, the VE was asked to assume that the hypothetical claimant could only maintain
concentration, persistence, or pace 30% of the time.  R. 438.  The VE responded that the claimant
could not perform either of the jobs with that restriction.  R. 438.

      C.    *Medical and School Records.*

      Early medical records reflect that Pierce was born prematurely.  R. 224.  She had
respiratory problems and delays in gross motor development.  R. 210.  A psychological report
prepared in May 1995, reflects that Pierce had been diagnosed with Spastic Diplegic Cerebral
Palsy.  R. 232; *see also* R. 253.  Psychological tests indicated that Pierce was then functioning
within the mid-borderline to lower average range of intelligence.  R. 234.

      Pierce's early school records reflect that reading comprehension was difficult for her.  R.
264.  She also did not complete assignments.  R. 267.

      One of Pierce's ninth-grade teachers completed a questionnaire in April 2000.  She
reported that Pierce was reading, writing and spelling at a fourth-grade level.  However, Pierce was
above-average as compared to other learning impaired students.  R. 106.  She reported that Pierce
was polite, and communicated without difficulty.  R. 107.  Pierce was able to stay on task and
complete assignments within allotted times.  R. 107-08.  She walked with a limp.  R. 108.  Her
hygiene was good.  R. 108.

      Pierce was seen by Franciso E. Rosillo, M.D., on May 3, 2000.  R. 242.  Dr. Rosillo noted
that Pierce was born prematurely at about six and one-half months, and she was diagnosed with
cerebral palsy in early infancy.  R. 242.  She had previously had surgery on her right ankle, but at

the time of the examination she was walking fairly well without any assistive device although her right leg was spastic.  R. 242-43.  Dr. Rosillo noted that Pierce was in good physical condition.  R. 242.  She was a slow learner in school, but she could read, write, and do simple mathematics.  R. 242.

During the exam, Dr. Rosillo observed that Pierce's right leg was one-third of an inch smaller and atrophic compared to her left leg.  Her reflexes were absent in her left leg. Dr. Rosillo's diagnosis was cerebral palsy.  R. 243.  Dr. Rosillo concluded that Pierce would not be able to do more than moderate physical work for more than four or five hours a day because of her cerebral palsy and her limited education.  R. 244.

On May 5, 2000, Pierce was seen by David J. Fleischmann, Ph.D., for a consultative psychological evaluation at the request of the State of Florida Department of Health, Division of Disability Determinations.  R. 245.  Dr. Fleischmann noted that Pierce's records revealed a history of cerebral palsy and borderline to low average intellectual functioning.  R. 245.  Pierce reported that she was repeating the ninth grade because of a low GPA.  R. 245.  Upon examination,  Dr. Fleischmann observed that Pierce walked with a prominent limp and an odd gait, causing her to have slower than average mobility.  R. 245.  Pierce's speaking and thinking were logical and coherent.  R. 245.  On the Wechsler Adult Intelligence Scale - Revised, Pierce received a verbal IQ score of 74, and performance IQ of 73, which resulted in a full scale IQ score of 73.  R. 246.  These scores placed her in the borderline range of intellectual ability.  R. 246.  Her scores on achievement tests demonstrated that she struggled with calculations and numeric functions and the technical aspects of written language.  R. 246.  Dr. Fleischmann's diagnosis was adjustment

disorder with physical complaints, chronic; borderline intellectual functioning; and, cerebral palsy. R. 247.

On April 23, 2001, Orange County Public Schools prepared an Individual Education Plan. R. 248-79.  In the report, the evaluators noted that Pierce's disability affected her walking, her stamina, and her writing skills.  R. 249.  To improve her chances of employment after graduating from high school, the report noted that she needed to improve her editing and employability skills. R. 249.

On February 25, 2002, one of Pierce's twelfth-grade teachers completed a Teacher/Counselor Questionnaire.  R. 146.  In the questionnaire, she noted that Pierce's reading and math skills were below her current grade level.  R. 416.  Pierce was reading a text book intended for fourth grade students.  R. 146.  Pierce behaved well and, as she got along with others, demonstrated good social skills.  R. 147.  Pierce stayed on task, completed assignments in the time allocated, displayed appropriate hygiene, and did not need special accommodations for physical problems.  R. 148.

Pierce was evaluated by Nitin Haté, M.D., on March 4, 2002.  R. 280.  Pierce reported having cerebral palsy since birth, mostly affecting her right leg and right arm.  R. 280. Upon examination, Dr. Haté observed that Pierce looked healthy and was well nourished, pleasant, and not in discomfort.  R. 280.  Dr. Haté noted a mild right leg atrophy, and that Pierce limped with a slight drag of the right leg.  R. 280.  Pierce also had mild loss of coordination in the right upper and lower extremities.  R. 281.  Dr. Haté's diagnosis was mild cerebral palsy affecting the right upper and lower extremities.  R. 282.  He concluded that Pierce would have difficulty walking and

partaking in activities requiring balancing, such as climbing ladders or scaffolds.  R. 282.  Pierce

was advised against working at unprotected heights.  R. 282.

On March 8, 2002, Pierce was referred by the Division of Disability Determinations to

Kevin J. Witham, Ph.D., for an evaluation.  R. 283.  Dr. Witham observed that Pierce had a

noticeable limp.  R. 283.  Pierce minimized her limitations from cerebral palsy, denying any

complaints of emotional distress, but she admitted getting irritated with her limitations.  R. 284.

Dr. Witham found Pierce's insight to be poor, and her judgment lacking.  R. 284.  She displayed

adequate attention and concentration for her intellectual level.  R. 284.  Dr. Witham's diagnosis

was borderline intellectual functioning.  R. 284.

On May 16, 2003, Edith Raby, a job placement specialist at Goodwill industries, wrote a

letter concerning Pierce's ability to work.  R. 338.  Ms. Raby noted that Pierce had worked for

Goodwill Industries for four months, at which time it was observed that her production was half of

that as a non-disabled employee.  R. 338.  Her lack of production was caused by poorly integrated

fine and gross motor skills and an inability to follow multi-step directions.  R. 338.  After

conducting an employability assessment, Ms. Raby determined that Pierce was not a viable

candidate for competitive employment at that time.  R. 338.

A Comprehensive Vocational Evaluation Report was prepared by Quest Inc. on March 18,

2004, evaluating Pierce's ability to work.  R. 408-13.  The report reflects that Pierce was then

performing at a fourth-grade level in math and spelling.  R. 408.  The report noted that, during an

interview, Pierce reported limitations in standing and walking and was observed having difficulties

with speed, manual dexterity, and coordination during testing.  R. 408.  She displayed strengths in

learning new tasks and working independently and accurately without need of prompting or

additional instruction. R. 408. However, her work pace was slow and she had low accuracy. R. 410. She performed best while working in a seated position. R. 408. The examiner opined that Pierce would need accommodations to account for her physical impairment. R. 408.

The SSA conducted a telephone interview in December 2005, with a physical therapist who had been treating Pierce. The therapist indicated that Pierce had been prescribed short leg braces to help her stand flat-footed. Pierce was able to stand by pulling up on furniture, and she held on to furniture or someone's hand as she walked due to balance problems. She was unable to walk more than a few steps independently. R. 202.

     D.    *Reviewing Professionals*.

        1.   <u>Physical Functional Capacity Assessments</u>.

In April 2002, M. delaCerna, M.D., completed a physical RFC assessment after reviewing Pierce's medical records. R. 303-10. Dr. delaCerna opined that Pierce could lift up to twenty pounds occasionally and ten pounds frequently. R. 304. She could stand or walk for at least two hours and sit for about six hours in an eight-hour workday. R. 304. She could occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds, and her fine manipulation ability was limited. R. 305-06. She should avoid even moderate exposure to hazards, such as machinery and heights. R. 307.

David Z. Kitay, M.D., prepared a physical RFC assessment after reviewing Pierce's records in June 2002. R. 329-36. Dr. Kitay opined that Pierce could lift up to twenty pounds occasionally and ten pounds frequently. R. 330. She could sit, stand, or walk for about six hours in an eight-hour workday. R. 330. She could only occasionally balance and climb ropes, and scaffolds. R.

331.  Her gross and fine manipulation abilities were limited.  R. 332.  She should avoid

concentrated exposures to hazards, such as machinery and heights.  R. 333.

>    2.    <u>Mental Functional Capacity Assessments</u>.

In March 2002, T. Wayne Conger, Ph.D., completed a Psychiatric Review Technique form

and mental RFC form after reviewing Pierce's records.  R. 285-302.  Dr. Conger opined that

Pierce had borderline intellectual functioning.  R. 290.  He concluded that Pierce would have mild

limitations in activities of daily living and maintaining social functioning, and moderate

limitations in maintaining concentration, persistence, or pace.  R. 299.  He further concluded that

Pierce would be moderately limited in the following abilities: understanding, remembering, and

carrying out detailed instructions.  R. 285.  Dr. Conger concluded that Pierce was capable of

performing simple, routine tasks on a sustained basis.  R. 287.

Also in March 2002, May Tay, Ph.D., completed a Psychiatric Review Technique form and

mental RFC form after reviewing Pierce's records.  R. 311-28.  Dr. Tay observed that Pierce had

borderline intellectual functioning (B.I.F.).  R. 312.  Dr. Tay opined that Pierce would have mild

limitations in activities of daily living and maintaining social functioning, and moderate

limitations in maintaining concentration, persistence, or pace.  R. 299.  Dr. Tay concluded that

Pierce would be moderately limited in the following abilities: understanding, remembering, and

carrying out detailed instructions, and maintaining attention and concentration for extended

periods, and setting realistic goals or making plans independently from others.  R. 325-26.  Dr. Tay

wrote that Pierce had "sufficient adaptive & cognitive skills for S/R/R[4] tasks on a sustained basis." R. 327.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(A).

The ALJ evaluated Pierce's application for SSI benefits using the five-step sequential evaluation applicable to an initial application filed by an adult claimant.  R. 9A, 343.  However, the Commissioner asserts that the medical improvement standard should apply when evaluating whether a previously disabled child remains disabled after attaining age 18.  *See* Doc. No. 33 at 4. If the ALJ used the incorrect standard of review, that alone would likely be sufficient to require reversal and remand of the decision.  *See Tauber v. Barnhart*, 438 F. Supp. 2d 1366 (N.D. Ga. 2006)(citing *Moncrief v. Gardner*, 357 F.2d 651 (5th Cir. 1966)).  However, because Pierce does not raise this contention, and the issues presented can be decided without resolving that issue, the Court need not determine whether the medical improvement standard or the adult evaluation standard is applicable.

―――――――――――――――

[4]  This appears to refer to simple, repetitive, routine tasks.

A court's review of a final decision by the SSA is limited to determining whether the

ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*,

847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C.

§ 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do

more than create a suspicion of the existence of the fact to be established. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v.

Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well

as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the

court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210.  The court

may not reweigh the evidence or substitute its own judgment. *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption

attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating

claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if

the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient

reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health &

Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143,

1146 (11th Cir. 1991)).

## V.     ANALYSIS.

Pierce asserts that the ALJ erred in failing to comply with the Appeals Council's remand order and improperly analyzed Pierce's mental impairments.  Pierce further asserts that the ALJ erred in concluding that there is other work in the national economy that she can perform.[5]  I address in detail only two of these issues, because they are dispositive.

A.     *The ALJ Failed to Comply with the Appeals Council's Remand Order.*

As noted above, the Commissioner concedes that the ALJ did not comply with that portion of the Appeals Council's remand order that required the ALJ to obtain updated consultative examinations.  The Commissioner contends that this error is harmless because the issue was whether Pierce's disability benefits were properly terminated as of June 2002, and a more recent consultative examination could not add to the evidence regarding Pierce's condition as of that date.

As a preliminary matter, the Court notes that the Commissioner's present argument is contrary to the argument his attorney made during the hearing before Judge Glazebrook regarding the Commissioner's motion to remand the case.  In that hearing, counsel for the Commissioner argued that "it really is clear that there isn't enough information in this record for the ALJ to have made a determination by himself as to whether or not Miss Pierce could work . . . ."  R. 354.  Similarly, the Commissioner's argument also is inconsistent with the finding of the Appeals Council, in a decision dated February 26, 2005, requiring the ALJ to obtained updated consultative examinations.  R. 384.

---

[5] The parties were advised that issues not specifically raised would be waived.  Doc. Nos. 10 at 2, 30 at 2.

The social security regulations require that "[t]he administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."  20 C.F.R. § 416.1477(b); *cf. Gibbs v. Barnhart*, 130 Fed. Appx. 426, 430 (11th Cir. 2005)(noting that "in order to fully discharge the Appeals Council's mandate," the ALJ was required to take the steps required by the Appeals Council).  Failing to abide by the Appeals Council's instructions is reversible error.  *See, e.g., Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1375-76 (N.D. Ga. 2006); *see also Allen v. Astrue*, Civil No. 06-cv-018, 2007 WL 1276933, at * 3-4 (E.D. Pa. May 1, 2007); *Hutchison v. Apfel*, No. 2:98-cv-087, 2001 WL 336986, at * 11 (N.D. Tex. March 9, 2001); *Mann v. Chater*, No. 95 CIV 2997 (SS), 1997 WL 363592, at * 3 (S.D.N.Y. June 30, 1997).

In the present action, as the Commissioner has acknowledged that he failed to comply with the order of the Appeals Council, remand is required so that the Commissioner can complete the steps required by this Court's earlier order, pursuant to the directions of the Appeals Council.

B.     *The ALJ's Did Not Make the Required Findings Regarding Pierce's Mental Impairment.*

Pierce argues that after the ALJ concluded that she had a severe mental impairment, borderline intellectual functioning, the ALJ failed to make findings concerning the four factors set forth in 20 C.F.R. § 416.920a.  This regulation requires an ALJ to use a special technique to evaluate the degree of functional limitations arising from a mental impairment.  *See* 20 C.F.R. § 416.920a(a).  The ALJ must rate the claimant's functional impairment in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  *See* 20 C.F.R. § 416.920a(c)(3).  The ALJ must also document his

-17-

findings by use of a standard document, the PRTF, or by making a "specific finding as to the

degree of limitations in each of the functional areas" in his written decision.  *See* 20 C.F.R. §

416.920(c)(e)(1), (2).  Failure to comply with this section of the regulations requires remand.

*Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005).

   Once again, the Commissioner concedes that the ALJ failed to follow the regulations.  He

did not attach a PRTF to his decision after remand, and he failed to make specific findings

regarding the degree that Pierce's borderline intellectual functioning limited her abilities in each of

the four functional areas described in § 416.920a.  *See* Doc. No. 33 at 11 n. 3.  The Commissioner

argues that this error is harmless because, in the ALJ's original decision, he adopted the reviewing

psychologists' assessments regarding these functional areas, and there was no evidence to show

that Pierce's mental condition had deteriorated.  *Id.*

   As the Eleventh Circuit stated in *Moore*, "the fact that the ALJ complied with the PRTF

method and regulations when he first evaluated Moore's claim in 1996, prior to remand, is not

sufficient to excuse his failure to do so here."  405 F.3d at 1214.  While the *Moore* court found the

ALJ's failure in that case to be particularly troubling because Moore presented non-frivolous

evidence suggesting her medical condition has deteriorated since the original decision was

rendered, the court's holding does not require such a showing before an ALJ is required to comply

with the § 416.920a.  Rather, the court in *Moore* held "that where a claimant has presented a

colorable claim of mental impairment, the social security regulations require the ALJ to complete a

PRTF and append it to the decision, or incorporate its mode of analysis into his findings and

conclusions.  Failure to do so requires remand."  *Id.*

It is undisputed that Pierce showed more than a colorable claim of mental impairment – the ALJ concluded that she had borderline intellectual functioning.  It is also undisputed that the ALJ did not attach a PRTF to his decision after remand or make findings regarding Pierce's mental limitations in the four functional areas in his written decision.  As such, remand is required to permit the Commissioner to make the necessary findings.[6]

  C. *An Award of Benefits is Not Appropriate.*

Pierce argues that because her entitlement to disability benefits is clear from the record, the Court should remand the case for an award of benefits.  Doc. No. 32 at 18-19.  An award of benefits is appropriate only when the Commissioner has considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).   As discussed above, the Commissioner has not adequately considered the evidence because he has not obtained updated consultative examinations addressing Pierce's work abilities in light of specifically articulated findings about the functional limitations arising from Pierce's mental impairment.  Therefore, an award of benefits is not appropriate.

On remand, the Commissioner should more fully develop the record as directed by the Appeals Council.  After the record is developed, the Commissioner must specifically address the appropriate standard of review.  If the medical improvement standard applies, he must first compare Pierce's condition before the most recent finding of disability (the comparison point date or CPD) with her condition after the CPD.  *See, e.g., Williams v. Apfel*, 73 F. Supp. 2d 1325, 1337

---

  [6]  Because remand is required for the reasons stated above, it is not necessary for the Court to address the remaining assignments of error.

(M.D. Fla. 1999)(and cases cited therein).  Only if he finds that Pierce's condition has improved

with respect to her ability to work would he proceed to a determination of whether there are jobs

available in the national economy that Pierce could perform.  *See Griego v. Sullivan*, 940 F.2d 942,

944 n.1 (5th Cir. 1991) (per curiam) (setting out eight-step inquiry required for assessing medical

improvement).  The Commissioner shall follow the law of this circuit in assessing Pierce's

credibility, including her subjective complaints, and articulate specific reasons for his findings.

## VI.    RECOMMENDATION.

For the reasons stated herein, I respectfully recommend that the decision of the Commissioner

be **REVERSED** and that this case be **REMANDED** for further proceedings.  I further recommend

that the Court direct the Clerk of Court to enter judgment consistent with its decision on this Report

and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained

in this report within **eleven (11) days** from the date of this Order shall bar an aggrieved party from

attacking the factual findings on appeal, and any responses to written objections shall be filed on

or before September 17, 2007.

Recommended in Orlando, Florida on September 1, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party

Courtroom Deputy